# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
**No. 21-593V**

|  |  |
|---|---|
| NICOLE EGBERT,<br><br>　　　　　　Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　Respondent. | Chief Special Master Corcoran<br><br><br>Filed: January 16, 2026 |

*Maximillian J. Muller, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Ryan Daniel Pyles, U.S. Department of Justice, Washington, DC, for Respondent.*

## <u>RULING ON DAMAGES</u>[1]

On January 12, 2021, Nicole Egbert filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] ("Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on September 18, 2020. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. The matter was conceded in Petitioner's favor, but the parties could not agree to damages, so their dispute was presented for my resolution.

**For the reasons set forth below, I find that Petitioner is entitled to compensation in the amount of $140,000.00 for past pain and suffering, and**

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

**$2,908.81 in past unreimbursable expenses. Petitioner is also entitled to a damages component for past and future lost wages, in an amount to be calculated by the parties in accordance with the terms of this Ruling.**

## I.    Procedural History

The case was assigned to the SPU in January 2022. ECF No. 15. On May 23, 2022, Petitioner filed an Amended Petition. ECF No. 20. On May 1, 2023, Respondent filed a Rule 4(c) Report conceding entitlement to compensation and I entered a Ruling on Entitlement in Petitioner's favor. ECF No. 31-32. On June 13, 2023, Petitioner filed a status report indicating that the parties had reached an impasse on damages and requested permission to retain a vocational expert and economist to provide an opinion on her claim for lost wages. ECF No. 36. Respondent then indicated that he wished to retain his own experts. ECF No. 44. After I granted these requests, Petitioner filed her reports on October 17, 2023 and Respondent filed his responsive reports on December 26, 2023. ECF Nos. 45, 49.

The parties resumed their attempts to informally resolve damages: Petitioner filed medical records meant to address the questions raised by Respondent's vocational expert, and Respondent filed a supplemental report. ECF Nos. 50-51, 54. However, by July 2024, the parties reported that they continued to disagree on Petitioner's future work capacity. ECF No. 55. I thus ordered the parties to file damages briefs by September 20, 2024. However, before this date, Respondent moved for an extension and for permission to retain an expert orthopedist. ECF No. 58. I denied this request and set a new briefing deadline, noting that there was no reason to further halt the progression of this matter and that Respondent had been given ample opportunity to provide expert testimony. ECF No. 61.

On September 27, 2024, the parties filed their simultaneous damages briefs. ECF Nos. 62 ("Pet'r Br."), 63 ("Resp't Br."). On October 30, 2024, the parties filed simultaneous response briefs. ECF Nos. 64 ("Pet'r Resp. Br."), 66 ("Resp't Resp. Br."). On the same day, Respondent also filed a supplemental report by his economic expert. ECF No. 65. Due to this new expert filing, I approved Petitioner's request to file a rebuttal report. ECF No. 67. However, on December 6, 2024, Petitioner indicated that she had decided not to file any rebuttal report. ECF No. 68.

On March 25, 2025, I held a status conference and ordered the parties to file a joint status report stating whether they would like to proceed with resolution of damages via a "Motions Day" argument, or whether they believed that the issues could be resolved

based on the record as filed. On April 4, 2025, the parties indicated that they wished to proceed on the record as filed. ECF No. 69. This matter is thus ripe for resolution.

## II.     Factual Findings

### A.      Petitioner's Employment History and Initial Treatment

Petitioner was 35 years old at the time of vaccination. Ex. 4 at 4. Her medical history was significant for Type 1 diabetes, which she managed using an insulin pump. *See, e.g.*, Ex. 5 at 115-116. Petitioner did not have any previous left shoulder injuries or symptoms, but had undergone an ulnar nerve transposition in her right arm in 2016. Ex. 15 at 261.

Petitioner had been employed as a dental hygienist since 2010. Ex. 24 at 8. She had a history of working in this profession both full-time and part-time. In 2015 and 2016, Petitioner worked full-time. *Id.* at 7. Starting in 2017, Petitioner and her husband began fostering children, and Petitioner changed her schedule to part-time to primarily be a stay-at-home parent. *Id.* at 11. In approximately November 2019, Petitioner stepped away from her hygienist job entirely due to her family obligations. *See* Ex. 16 at 127; Ex. 5 at 14, 97. However, in March 2020, Petitioner returned to work four days per week with her previous employer, dentist Dr. David Lewis. Ex. 24 at 8. Petitioner was unable to work between March 2020 and May 2020 when Dr. Lewis' office closed due to the COVID-19 Pandemic, but she resumed working four days per week in June 2020. *Id.* at 8, 11; Ex. 33 at 1. Petitioner was "excited to be back at [her] office and being able to contribute to [their] recently increased family household." Ex. 33 at 1.

On September 18, 2020, Petitioner received the flu vaccine in her left shoulder at her primary care provider ("PCP") office. Ex. 3 at 1. Petitioner returned to her PCP office on September 20, 2020, complaining of left arm pain and a decreased range of motion ("ROM"). Ex. 4 at 4. According to her treater, Petitioner was "very upset because she feels like she may not be able to work tomorrow due to pain." *Id.* Petitioner stormed out of the office when she was told merely to continue taking anti-inflammatories and was not given oral steroids. *See id* at 5.

On October 14, 2020, Petitioner underwent a left shoulder MRI at her local medical center. Ex. 9 at 3. The MRI revealed subtle tendinopathy in the supraspinatus tendon with no rotator cuff tear, small glenohumeral joint effusion and trace amount of fluid in the subacromial bursa, and mild edema in the teres minor muscle and along the periphery of the infraspinatus and subscapularis muscles. *Id.* at 4. The interpreting physician also noted that the mild edema observed could be due to muscle strains, but that a joint

infection was also not excluded. *Id.* Further, an "[u]nusual reaction to the immunization [was] not entirely excluded but this would be very unusual and the subcutaneous tissues and deltoid muscle appear normal." *Id.*

Petitioner had an initial evaluation with physician assistant ("PA") Jeffrey Griggs at The Shoulder Clinic of Idaho ("Shoulder Clinic") on October 22, 2020. Ex. 7 at 10. Petitioner complained of pain since the vaccination, and that it had been exacerbated by a plane flight in October. *Id.* Petitioner described left shoulder pain that "waxed and waned" despite topical medications. *Id.* Petitioner also noted "difficulty getting her arm up for any period of time to function at work as needed." *Id.* After discussion of various treatment options, Petitioner decided to continue with NSAIDs, topical Voltaren gel, and activity modification, and then would follow-up within two weeks. *Id.* at 13.

Petitioner had her follow-up appointment with Dr. Jared Johnson at the Shoulder Clinic on October 30, 2020. Ex. 7 at 8. Dr. Johnson diagnosed Petitioner with a SIRVA and again reviewed treatment options. *Id.* at 9. Dr. Johnson gave Petitioner the option of an aspiration, but she elected to "continue active follow up and monitoring with physical therapy." *Id.* Petitioner also stated that anti-inflammatories had helped and that she preferred not to have a steroid injection due to her diabetes. *Id.*

On November 4, 2020, Petitioner had her first physical therapy ("PT") session at Pierce Physical Therapy and Sports Rehab ("Pierce PT"). Ex. 6 at 2. Petitioner reported "ongoing constant pain" in her left shoulder that caused her to be unable to work as a hygienist. *Id.* Petitioner also stated that she was taking meloxicam but "ha[d] not found significant relief." *Id.* Petitioner's pain was at worst an 8/10 and 4/10 at best. *Id.* The physical therapist noted that Petitioner exhibited "[s]evere muscle guarding due to pain and apprehension of movement." *Id.* at 3.

Petitioner saw PA Griggs at the Shoulder Clinic on November 17, 2020. Ex. 7 at 3. Petitioner reported that her symptoms were "slightly better" but still inhibited her from working on a regular basis and also affected her sleep. *Id.* PA Griggs prescribed Petitioner diclofenac instead of meloxicam and encouraged her to continue with PT. *Id.* at 4.

Petitioner had two more sessions at Pierce PT on December 10 and 14, 2020. Ex. 7 at 6-8. At her second session, Petitioner stated that she was back at work "filling in," but had been having considerable pain, including while doing daily tasks and sleeping. *Id.* at 6. Nonetheless, Petitioner reported "minimal pain or discomfort in the shoulder" following treatment. *Id.* At her third session, Petitioner stated that she had been "working full days with double patients as she is filling in for 2 hygienists at the moment, which has been

4

increasing the soreness of her shoulder." *Id.* at 8. Petitioner also noted a "great benefit" from taping her left arm. *Id.*

After December 14, 2020, Petitioner did not attend any further sessions at Pierce PT, although she was not discharged and had not completed her treatment goals. Other than an urgent care visit for COVID-19 symptoms, *see* Ex. 30 at 859, Petitioner did not receive any medical treatment, including for her left shoulder, for three and a half months.

### B.    Petitioner Resumes Treatment, Proceeds with Surgery, and Receives Long-Term Antibiotics for an Infection

On April, 1, 2021, Petitioner had a follow-up appointment with PA Griggs at the Shoulder Clinic, reporting that she was still in pain. Ex. 14 at 24. Petitioner stated that she was "back to work essentially full time as a dental hygienist." *Id.* Petitioner had also been prescribed tramadol for night pain, although she used this "very sparingly." *Id.* PA Griggs noted visible atrophy of Petitioner's upper extremities and Petitioner stated that she had been told by a trainer at a gym that she had a "substantially smaller tricep/arm measurement on the left vs. right stemming from lack of use of the [left upper extremity]." *Id.* PA Griggs ordered another MRI to compare with her previous imaging. *Id.* at 26.

On April 24, 2021, Petitioner underwent this second MRI. Ex. 15 at 235-36. The results were generally normal, but there was joint effusion with synovial thickening that had increased from the previous MRI. *Id.* at 236. However, the previously-seen edema in the rotator cuff muscles had resolved. *Id.*

Petitioner then saw Dr. Joseph Lynch at the Shoulder Clinic on May 5, 2021, for a second opinion. Ex. 14 at 20. Like PA Griggs, Dr. Lynch noted visible atrophy of Petitioner's left shoulder muscles. *Id.* at 21. Petitioner was interested in trying a steroid injection, but agreed to forego any injections or aspirations due to her diabetes and the injection-related nature of her injury. *Id.* at 21-22. Dr. Lynch also discussed surgical options. *Id.*

On May 13, 2021, Petitioner saw Dr. Johnson at the Shoulder Clinic and decided to proceed with surgery. Ex. 14 at 16-18. Petitioner underwent a left shoulder arthroscopy with lavage on May 17, 2021. *Id.* at 13-15. Although Petitioner did not present any signs of infection pre-surgery, Dr. Johnson felt that culturing the area of synovitis could be useful and took five deep soft tissue biopsies. *Id.* Petitioner was discharged on doxycycline. Ex. 13 at 2.

Post-surgery, Petitioner received PT from Foothills PT starting on May 18, 2021. Ex. 11 at 5. Petitioner completed five PT sessions through June 9, 2021. *Id.* at 10-16. At her June 9, 2021 appointment, the physical therapist found that Petitioner had regained at least 90% of her left shoulder mobility and recommended decreasing the frequency of sessions to once per week. *Id.* at 15-16. Petitioner did not attend any further sessions.

During the same month, Petitioner was seen by Dr. Thomas Coffman, an infectious disease specialist, because at least one of the cultured samples from her surgery grew cutibacterium acnes.[3] Ex. 13 at 2. Dr. Coffman believed that the flu vaccination inadvertently inoculated and "seeded" Petitioner's shoulder joint with this bacteria. *Id.* at 2-3. Dr. Coffman wrote that Petitioner had experienced a significant reduction in pain post-surgery, but it started to increase again in the last week. *Id.* at 2. Petitioner was switched from doxycycline to amoxicillin, which seemed to have resulted in her pain decreasing again. *Id.* Dr. Coffman prescribed another medication, probenecid, to take with the amoxicillin for the next three months. *Id.* at 3. Additionally, Dr. Coffman noted that if Petitioner's pain returned after stopping the antibiotics, he would order another course over six months.[4] *Id.*

On June 25, 2021, Petitioner contacted Dr. Coffman's office due to swollen lymph nodes and a body rash that had developed over the past one to two weeks. Ex. 12 at 7. Dr. Coffman's staff advised her to go to urgent care. *Id.* At urgent care, Petitioner was told to discontinue the amoxicillin and probenecid and was given doxycycline instead. *Id.* at 12. Petitioner then returned to Dr. Coffman's office on July 1, 2021 and was prescribed a 60-day course of a different antibiotic because the doxycycline caused nausea and vomiting.[5] Ex. 13 at 4.

At her eight-week follow-up post-surgery with PA Griggs, on July 13, 2021, Petitioner reported that she was "doing great" and was "very grateful for the relief that she has gotten since her surgery." Ex. 14 at 5. Petitioner's only complaint was some discomfort while sleeping, but this was "minimal" and could be corrected with positional changes. *Id.* Petitioner did note some increase in pain when switching antibiotics, but this

---

[3] Cutibacterium acnes is a bacteria typically found on human skin. *See Cutibacterium (ex.Propionibacterium) species*, Johns Hopkins ABX Guide, https://www.hopkinsguides.com/hopkins/view/Johns_Hopkins_ABX_Guide/540453/all/Cutibacterium__ex _Propionibacterium__species (last visited January 9, 2026).

[4] Petitioner also had an appointment with Dr. Johnson at the Shoulder Clinic on June 1, 2021. Ex. 14 at 8. Petitioner stated that she was significantly improved and was "basically back to normal." *Id.*

[5] On July 23, 2021, Petitioner called Dr. Coffman's office and stated that she had restarted her amoxicillin (presumably from her old prescription) because of pain in her shoulder and increased blood sugars. Ex. 18 at 7. Petitioner felt that her rash had been caused by the probenecid only. *Id.* Dr. Coffman provided Petitioner with a new prescription for amoxicillin. *Id.*

had been alleviated by taking the new prescription. *Id.* Petitioner saw PA Griggs again on September 17, 2021, and other than some minimal increased shoulder pain when she forgot to take her antibiotics for a few days and when flying, she reported that her condition was substantially better than pre-surgery.[6] Ex. 17 at 10. At this time, Petitioner was following a home exercise program ("HEP") and working out at the gym. *Id.* at 11.

Petitioner had her next appointment with Dr. Coffman on November 16, 2021. Ex. 18 at 9; Dr. Coffman wrote that Petitioner had just discontinued taking amoxicillin about one week earlier. Ex. 18 at 9. While on the amoxicillin, her pain had been well-controlled and she "barely ha[d] to take any medications." *Id.* Since stopping amoxicillin, she had a "little bit of increased pain," but it was a "1000 times better than it was." *Id.* Dr. Coffman also described Petitioner has having excellent ROM and doing "dramatically better." *Id.* Petitioner wanted to continue taking amoxicillin, and Dr. Coffman agreed and provided a six-month prescription at half her prior dose. *Id.* at 10; Ex. 17 at 7. Dr. Coffman did not think that any further surgical intervention would be needed and that she would continue to get better. Ex. 18 at 10. Despite the six-month prescription, Petitioner only stayed on antibiotics until January 2022. *See* Ex. 21 at 2.

Petitioner also saw PA Griggs on the same day, November 16, 2021. Ex. 17 at 7. Similarly, PA Griggs wrote that Petitioner was doing well and felt much better than she did prior to surgery, although she had some soreness "from time to time," primarily when she was not on antibiotics. *Id.* at 7-8. PA Griggs told Petitioner that she would gain strength over the first year post-op and indicated that she should follow up in May 2022. *Id.* at 8.

## C.    Petitioner's Left Shoulder Symptoms Return Over Time and Then Dissipate Again

On March 15, 2022, Petitioner returned to Foothills PT "due to not having the ROM and strength she wants[.]" Ex. 19 at 7. Petitioner complained that her left shoulder pain kept her up at night and she wanted to be able to do yoga and bow hunt. *Id.* Petitioner reported her best and current pain level as 1/10 and her worst as 6/10. *Id.* Petitioner also stated that her right shoulder had starting hurting from overcompensating and she was having numbness in both hands in the ulnar nerve area. *Id.*

Petitioner attended four more PT sessions between March and May 2022. In terms of her employment, Petitioner told the physical therapist that she had the most pain after working due to the positioning of her arm. *Id.* at 13. She also tried to change her

---

[6] PA Griggs quoted Petitioner as saying she "could like with this." Ex. 17 at 10. This appears to be a typographical error and Petitioner presumably stated that she "could live with this."

positioning when working and standing but was still experiencing numbness in her hands. *Id.* at 14. At her final session, Petitioner stated that her left shoulder still hurt and the hand numbness "still comes and goes bilaterally." *Id.* at 16. However, the physical therapist noted that Petitioner was working out regularly. *Id.*

On May 13, 2022, Petitioner saw a new PCP. Ex. 30 at 512. With regard to her left shoulder, Petitioner "continue[d] to have constant pain with severity that fluctuates." *Id.* at 513. Petitioner was listed as working part-time as a dental hygienist. *Id.* Petitioner also reported that she had stopped drinking alcohol recently and had previously been drinking two or more glasses of wine on a daily basis "to help manage her shoulder pain." *Id.*

Petitioner followed-up with PA Griggs at the Shoulder Clinic on May 17, 2022. Ex. 20 at 7. Petitioner primarily discussed the impact of her left shoulder symptoms on her employment.[7] *Id.* Although PA Griggs noted that Petitioner "maintains fairly good ROM," Petitioner's dental hygienist work caused "persistent left shoulder pain" from keeping her arm at or near shoulder level throughout the day. *Id.* Petitioner was currently working two days per week, but needed two to three days of recovery after each shift. *Id.* Further, when her shoulder hurt, she could not sleep well and she felt that her elevated blood glucose levels were caused by stress and loss of sleep. *Id.* Petitioner stated that she was unsure if she could maintain her current job with these issues. *Id.*

PA Griggs recommended that Petitioner try to get her blood glucose down to reduce inflammation. Ex. 20 at 9. He also suggested that Petitioner would benefit from continuing with PT and/or a HEP, and could potentially undergo another MRI in the future to see if another surgery would be beneficial. *Id.* PA Griggs also stated that Petitioner's left shoulder "may or may not get better in relation to her job moving forward in the future despite her good ROM." *Id.*

On June 28, 2022, Petitioner saw a colleague of Dr. Coffman, infectious disease specialist Dr. Camilla Reese. Ex. 21 at 2. Dr. Reese wrote that Petitioner began having shoulder pain again "[a] few months after stopping antibiotics . . . ." *Id.* Petitioner told Dr. Reese that she had recently been prescribed the antibiotic Augmentin for a sinus infection and that this had improved her shoulder pain. *Id.* at 2-3. Petitioner was concerned that she had recurrent shoulder infection. *Id.* at 3. Dr. Reese instructed Petitioner to complete the course of Augmentin and return for a further workup and MRI if the shoulder pain returned. *Id.*

---

[7] Petitioner no longer had any visible left shoulder muscle atrophy at this appointment. Ex. 20 at 8.

Petitioner returned to PA Griggs at the Shoulder Clinic on August 19, 2022.[8] Ex. 20 at 4. Petitioner reported that she continued to have some aches with activities and altitude changes, but "overall feels like she is doing better." *Id.* Petitioner had not been on antibiotics for several months and was trying a an anti-inflammatory died. *Id.* PA Griggs advised Petitioner to continue with PT and/or a HEP and follow-up on an as-needed basis. *Id.* at 5.

### D.    Petitioner's Final Left Shoulder Appointments

Petitioner did not receive any further care for her left shoulder until almost a year later.[9] On August 8, 2023, Petitioner saw PA Griggs for a follow-up because she "just ha[d] some questions." Ex. 22 at 5. Petitioner stated that she was only able to work one to two days per week as a dental hygienist "due to her continued ache with sustained activity at or about shoulder level which is her primary arm position with most of her work duties." *Id.* In terms of treatment options, PA Griggs recommended the conservative use of NSAIDs, ice, and acetaminophen, and explained that Petitioner was not a good candidate for a steroid injection due to her diabetes. *Id.* at 7. PA Griggs also provided Petitioner with a refill of diclofenac. *Id.* PA Griggs also recommended that she should maintain a HEP and would benefit from activity modification at work. *Id.*

Petitioner then returned see PA Griggs on March 29, 2024. Ex. 31 at 1. Petitioner reported that she was now limited by her symptoms to working one day per week. *Id.* PA Griggs examined Petitioner and found some mild limitation of her left shoulder ROM and positive Neer and Hawkins signs. *Id.* It appears that the purpose of this appointment was for Petitioner to obtain responses to certain medical questions posed by Respondent's vocational expert, discussed in further detail below. *See* Ex. A at 11; Ex. 31 at 3.

### E.    Petitioner's Declarations and Witness Statement

Petitioner submitted an extremely cursory declaration with her Petition in January 2021. *See* Ex. 1 at 1. On August 8, 2024, Petitioner filed a second, much more detailed

---

[8] On July 19, 2022, Petitioner saw her endocrinologist. Ex. 30 at 474. With regard to her left shoulder, Petitioner mentioned that she had taken antibiotics in June 2022 and that turmeric has "really helped her pain." *Id.* The endocrinologist also noted that Petitioner was working as a dental hygienist again (although the number of days per week was not listed) and had five children at home, but was no longer fostering. *Id.*

[9] Petitioner briefly referenced her left shoulder at some of her unrelated appointments. On January 31, 2023, at her annual physical, Petitioner indicated that diclofenac helped her shoulder the most, but she only needed to use it about once per month. Ex. 30 at 359. At a February 9, 2023 endocrinologist appointment, Petitioner mentioned that she was working as a dental hygienist two days per week and that her shoulder was doing well with "some occasional pain." *Id.* at 339. The same information was repeated in the notes of Petitioner's April 4, 2023 endocrinologist appointment. *See id.* at 318-19.

declaration. Ex. 33 at 1-4. Petitioner stated that she was in insufferable, agonizing pain within a few hours of the vaccination, and described this as the day that "would forever change [her] life." *Id.* at 1. Petitioner explained that when she returned to work after the pandemic shutdown, the pain was so severe that she had difficulty performing dental cleanings properly and changing the protective barriers in the room in between patients. *Id*. at 1-2. According to Petitioner, she "went from being a great dental hygienist to having patients request another hygienist because they felt they weren't getting good treatment. And they weren't wrong." *Id.* at 2. This was "devastating" to Petitioner professionally and she also feared the loss of income for her family if she could no longer work full-time. *Id.* Petitioner then attempted to work one day per month, but even this was "still agonizingly painful." *Id.*

Petitioner decided to undergo surgery "[i]n hopes to get [her] life back." Ex. 33 at 2. After the surgery, Petitioner believed that she would be able to work two days per week, with the shifts spaced out to give her time to recover. *Id.* However, she ultimately had to decrease to one day per week. *Id.* Petitioner's husband had to find a second job to make up for the loss of income. *Id.* Petitioner was considering going back to school for a different career, but was hesitant to start over and take out more student loans. *Id.*

In addition to the effect on her professional life, Petitioner stated that her left shoulder pain made it extremely difficult to travel to see her family and to care for her children. Ex. 33 at 3. Petitioner felt that her ability to pick up and bond with her youngest adopted child had been stolen from her by her injury. *Id.* Petitioner had difficulty sleeping for a year due to the pain. *Id.* Petitioner also described needing her husband's help with daily tasks like getting dressed and doing her hair. *Id.* Further, Petitioner could no longer pursue hobbies like bow hunting. *Id.* According to Petitioner, "[t]he grief cycle continues to be a never-ending [F]erris wheel that I cannot get off and may take years of counseling to work through." *Id.* at 4.

Petitioner's employer, Dr. Lewis, also submitted an unsworn letter, dated July 3, 2023. Ex. 23 at 1. Dr. Lewis confirmed that Petitioner had worked for him both full-time and part-time, as her family obligations allowed. *Id.* At the time of her injury, Petitioner was working full-time. *Id.* Dr. Lewis described that after the vaccination, Petitioner attempted to keep working, but needed a "substantial amount of help from [his] dental assistant to complete her tasks." *Id.* Petitioner then had to reduce her hours to one day per month. *Id.* Dr. Lewis stated that it was very difficult to find hygienists and that he "probably placed an inordinate amount of pressure on [Petitioner] to work as much as she can." *Id.* Petitioner agreed to come back to work but ended up only being able to work one day per week. *Id.* Dr. Lewis described Petitioner as very hardworking and a valued employee, who he hoped would be able to one day resume her previous schedule. *Id.*

10

III.     **Expert Reports**

   A.     **Petitioner's Vocational Expert – Staci Schonbrun, Ph.D.**

Petitioner engaged Dr. Staci Schonbrun as a vocational expert to analyze Petitioner's lost earning capacity. Dr. Schonbrun has a Ph.D. in Rehabilitation Counseling, and has been employed as a Certified Rehabilitation Counselor and Life Care Planner for 28 years. Ex. 26. Dr. Schonbrun interviewed Petitioner on August 1, 2023 and provided an expert report dated August 23, 2023. *See* Ex. 24 at 8.

After reviewing Petitioner's work history and earnings, Dr. Schonbrun opined that Petitioner's pre-injury earning capacity was best represented by her full-time schedule in 2015 and 2016, before she switched to a part-time schedule for family reasons in 2017-2019. *Id.* at 12. In particular, Dr. Schonbrun noted that Petitioner had recently returned to working four days per week (largely full-time) in 2020, before the COVID-10 Pandemic and her injury. *Id.* It was thus "reasonable that absent the date of injury, [Petitioner] had the education, work history and physical ability to work on a full-time basis as a dental hygienist." *Id.* Using the 2022 median wage for dental hygienists in Idaho from the United States Bureau of Labor Statistics, Dr. Schonbrun calculated that a reasonable measure of Petitioner's earning capacity at 32 hours per week would be $66,255.38 annually.[10]

With regard to her post-injury earning capacity, Dr. Schonbrun relied upon Petitioner's actual schedule history. In her interview with Dr. Schonbrun, Petitioner stated that she had worked two days per week for the past year, but "found that she was in [a] significant amount of pain at this level of employment and that her pain level significantly impacted her blood sugar and her diabetic condition." *Id.* at 9. Petitioner had recently reduced her schedule to one day per week in July 2023 and "has found that she is able to do this albeit with difficulty." *Id.* Again using the median wage for dental hygienists in Idaho, Dr. Schonbrun calculated that a reasonable measure of Petitioner's post-earning capacity at one day per week would be annual earnings of $16,563.85.[11] *Id.* at 14. Therefore, Dr. Schonbrun concluded that Petitioner's annual loss of earning capacity was $49,691.53 ($66,255.38 minus $16,563.85).[12] *Id.* at 15.

---

[10] Petitioner's average salary in 2015-16 was $60,342, which Dr. Schonbrun also stated was a "good indicator" of Petitioner's pre-injury earning capacity, although it would need to be adjusted to present value. Ex. 24 at 12.

[11] Dr. Schonbrun also provided an alternative calculation of $10,399.66, based on Petitioner's previous salary at two days per week divided by two. *Id.* at 14.

[12] Dr. Schonbrun include a standardized work life expectancy calculation, but stated that she deferred to an economist on this issue. *Id.* at 15. Dr. Schonbrun also deferred to an economist of calculation of inflation and discount rate. *Id.*

**B.    Respondent's Vocational Expert – Benush Mortimer, Ph.D.**

Dr. Benush Mortimer provided a rebuttal opinion for Respondent regarding Petitioner's vocational capacity. Ex. A at 10. Dr. Mortimer has a Ph.D. in Psychology with a specialization in industrial organizational psychology. Ex. E at 2. Dr. Mortimer also has had a long career in vocational rehabilitation counseling. *Id.* at 1-2. Dr. Mortimer did not interview Petitioner.

Dr. Mortimer found it "difficult to assess" Petitioner's vocational capacity "based on objective factors" because "most of the information relevant to her complaints are subjective statements reported by herself in affidavits or to providers." Ex. A at 10. However, Dr. Mortimer focused on Petitioner's "different medical and life circumstances" that made her participation in the workforce variable between full-time and part-time in the past. *Id.* Dr. Mortimer believed that a combination of Petitioner's Type I diabetes and familial demands, along with the vaccine injury, "could be contributing to [Petitioner's] overall stress and difficulties related to work." *Id.* Further, Petitioner's diabetes and family structure "will continue to be present in her life more likely than not." *Id.* at 11. Based on Petitioner's work history, Dr. Mortimer concluded that Dr. Schonbrun had overstated Petitioner's earning capacity by not taking into account the likelihood that there would be future periods in which Petitioner "will either medically or psychosocially need to work part-time." *Id.*

According to Dr. Mortimer, Petitioner's pre-injury earning capacity was best defined as the average of her annual earnings from 2015-19 in current dollars. *Id.* However, in order to finalize her opinion, Dr. Mortimer requested that medical professionals answer five questions about Petitioner's condition and current capacity to work. *Id.*

Petitioner posed these questions to PA Griggs at her March 29, 2024 appointment. The full questions, with PA Grigg's answers in italics, are quoted below:

1. Objectively, what is Ms. Egbert's physical restrictions and/or work restrictions, if any?

*Ms. Egbert will benefit from an altered work schedule due to the nature of her job as a dental hygienist working at or above shoulder level for several hours per day. This may be altered working days or shorte [sic] work days. Ergonomically adjustable adjustment such as higher seating may alleviate some of the symptoms associated with her prior diagnosis and surgery/treatment.*

2. What is the causation of Ms. Egbert's work restrictions. For

12

example, is the bilateral hand numbness related to the SIRVA or her diabetes Type I?

> *It is my professional opinion that the BIL hand numbness is not related the SIRVA diagnosis and related to her occupation. However, continued aching and pain associated with her job duties as described above is related to the SIRVA diagnosis. DM I also can contribute to peripheral neuropathies of the UE and LE.*

> 3. Should Ms. Egbert's stated limitations to work only 2 days per week be found valid and reliable given the type of SIRVA she experienced? How about 1 days per week?

> *It is my professional judgement that altering days (ie. 1 day on/off for a total of 2-3 days per week) would be appropriate given her diagnosis. This may vary based on her work load throughout each shift and may be need to be reduced to 1-2 days per week with high work loads and hours per day.*

> 4. How much, if any, is Ms. Egbert's Diabetes Type I playing a role in her current capacity to work?

> *I have not seen any BG logs and she reports great control of her BGs with her insulin pump/monitoring system. Type I DM was a contributing factor for the initial diagnosis and treatment, but if the information on BG control that she is reporting is accurate, it should not be affecting her current capacity to work.*

> 5. How much if any, is Ms. Egbert's familial demands playing a role in her current capacity to work?

> *I am unfamiliar with her familial demands from a clinical standpoint and cannot comment on this matter.*

Ex. 31 at 3. Additionally, PA Griggs suggested that Petitioner could undergo a "work hardening regimen" to help increase her ability to work longer or more days, but this could also potentially "exacerbate her inflammatory symptoms worsening her ROM and ability to function normal at work." *Id.* PA Griggs also noted that if Petitioner needed any further legal documentation, she should follow up with Dr. Johnson "to determine long term restrictions" because he "does a large amount of work assessments" for worker's compensation. *Id.*

Dr. Mortimer also prepared a supplemental expert report based on PA Grigg's March 29, 2024 examination and answers to her questions. Ex. C at 4. Dr. Mortimer first expressed the opinion that Petitioner's "complaints of significant shoulder pain do seem somewhat inconsistent with [PA] Grigg's physical exam," which showed mild ROM

limitations but full strength. *Id.* However, Dr. Mortimer deferred resolution of this question to the finder of fact. *Id.*

Next, based on PA Grigg's suggestion that Petitioner could work between one to three days per week, depending on workload and hours, and "taking the average of his statement," Dr. Mortimer opined that Petitioner was currently able to work two days per week. *Id.* Dr. Mortimer assessed Petitioner's pre-injury capacity as three days per week, based on the average of her previous range between two and four days per week. *Id.* Therefore, comparing these two figures, Dr. Mortimer concluded that Petitioner had experienced a 33% reduction in work capacity from her injury.[13] *Id.*

### C.    Petitioner's Economic Expert – Robert Cook, Ph.D.

Petitioner's economic expert, Robert Cook, holds a Ph.D. in Economics and has been employed as a professor at the University of Richmond for 44 years. Ex. 29 at 1. Relying on Dr. Schonbrun's determination that Petitioner has suffered an annual loss of earning capacity of $49,691.53, Dr. Cook calculated Petitioner's total net lost earnings through the end of her actuarial work life as $753,850.00, including past lost wages of $142,045.00 from the date of vaccination through the date of the expert report. Ex. 27 at 4-6. Dr. Cook did not adjust Petitioner's past lost wages to present value. *Id.* at 6.

Dr. Cook explained the elements that were used to reach this figure. First, Dr. Cook distinguished between work life and retirement age and used a work life expectancy of 22.5 years because it is "unlikely that she will be employed full-time and continuously from age 35 to age 67." *Id.* at 6. A work life expectancy of 22.5 years accounts for "probable interruptions in employment prior to her retirement age." *Id.* at 6-7. Second, Dr. Cook discounted the future net earnings to present value by using a variable after-tax discount rate of 4.33 to 5.47 percent based on the yields on United States Treasury Notes and Bonds as of the date of his report. *Id.* at 5; Ex. 8 at 1. Third, Dr. Cook adjusted Petitioner's future earnings using a variable tax rate between 16.2 and 19.2 percent. Ex. 28 at 1. Dr. Cook provided several tables containing these calculations. *See* Ex. 28 at 1-5.

### D.    Respondent's Economic Expert – Patrick Kennedy, Ph.D.

Dr. Patrick Kennedy provided a rebuttal report regarding Petitioner's economic losses. Dr. Kennedy holds a Ph.D. in Economics and is employed by the firm Stout, a

---

[13] Dr. Mortimer did not alter her initial opinion that Petitioner's pre-incident earning capacity was best defined by the average of her 2015-2019 income brought to current dollars. Ex. C at 4.

14

global investment bank and advisory firm. Ex. B at 1. Like the other experts engaged in this matter, Dr. Kennedy has submitted opinions numerous times in the Vaccine Program.

Dr. Kennedy relied on Dr. Mortimer's opinion that Petitioner's pre-incident earning capacity is best represented by her average annual earnings from 2015 through 2019, which he calculated as $50,924.00.[14] *Id.* at 4. However, Dr. Kennedy did not provide a final calculation of past and future lost wages because Dr. Mortimer had not yet submitted her supplemental opinion. *See id.* at 5. Nonetheless, Dr. Kennedy opined on what discounts and offsets should be used.

Specifically, Dr. Kennedy stated that he would apply a discount rate of 1.1 percent to adjust future lost wages to present value. *Id.* Dr. Kenndy based this rate on his analysis of the current and projected (as of December 2023) future interest rates, inflation, and wage growth. *Id.* at 6-8. Based on Federal Reserve forecasts and historical rates, Dr. Kennedy used a 1.50 percent net discount rate for consumer price inflation. *Id.* at 11. Dr. Kennedy then considered that wage growth in the office of dentists has exceeded inflation by approximately 0.4 percent over the past 20 years. Dr. Kennedy subtracted this amount to reach a final net discount rate of 1.1. percent. *Id.* Dr. Kennedy disagreed with Dr. Cook's discount rates, stating that "current interest rates as of a particular day are not a reliable basis to discount earnings loss damages particularly in the current economic environment." *Id.* at 12.

With regard to additional offsets, Dr. Kennedy stated that he would apply a 23 percent income tax rate to Petitioner's annual earnings based on married filing jointly status. *Id.* at 5. Dr. Kennedy also calculated Petitioner's statistical work life expectancy as 24.19 years, although her projected final separation from the workforce would be 30.39 years after vaccination. *Id.* at 4. Dr. Kennedy would thus multiply each year of Petitioner's future earnings by 0.80 (the ratio of 24.19 to 30.39) to "account for statistical worklife." *Id.* at 4.

On October 30, 2024, in conjunction with the parties' simultaneous response briefs, Respondent submitted a supplemental report from Dr. Kennedy. Dr. Kennedy opined that Petitioner's total potential economic loss is $377,029.00, consisting of $72,181.00 in past lost wages and $304,848.00 in future lost wages. Ex. D at 2. Dr. Kennedy reached this conclusion by starting with earnings of $50,924.00 per year over 30.19 years and applying the 80 percent work life adjustment, a wage growth rate, a 33 percent reduction based on Dr. Mortimer's analysis, a 23 percent tax rate, and then a 1.1

---

[14] Dr. Kennedy took Petitioner's actual annual earnings and indexed them to 2020 dollars based on the United States Bureau of Labor Statistics index for dental offices. Ex. B at 4.

percent net discount rate to reduce to present value. *Id.* at 1-2. Dr. Kennedy also reduced past lost wages to present value. *Id.* at 7-8.

## IV.    Damages to be Awarded

### A.    Pain and Suffering

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs*., No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[15]

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

Petitioner seeks a pain and suffering award of $160,000.00. Pet'r Br. at 11-15. In support, Petitioner cites *Bryant* ($140,000.00), *Monson* ($155,000.00), and *Anglewicz*

---

[15] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

($130,000.00).[16] *Id.* Petitioner argues that her injury and treatment were more severe than in these cases, thus meriting a higher award. *See id.* Respondent instead proposes an award of $125,000.00, relying on *Walker* ($122,000.00), *Stoliker* ($120,000.00), and *Rafferty* ($127,500.00).[17] Overall, Petitioner's cases are the most appropriate comparators, but there is no basis for finding her circumstances to be significantly worse. For the reasons stated below, I will award $140,000.00.

The severity and duration of Petitioner's treatment has strong similarities to *Bryant*. The *Bryant* petitioner was 17 years old high school senior at the time of vaccination and a competitive hockey player. *Bryant*, 2024 WL 1739776, at *1. She sought treatment within two weeks and then treated "consistently, but conservatively, for the first seven months after vaccination." *Id.* at *7. During this time period, she was prescribed gabapentin, but did not pursue formal PT or steroid injections, and was able to play hockey and exercise daily. *Id.* at *2. The *Bryant* petitioner then had a treatment gap of 18 months until she went to the emergency room complaining of constant right shoulder pain. *Id.* Thereafter, she "endured aggressive treatment, including a steroid injection before arthroscopic surgery and eight post-operative physical therapy sessions over the following year." *Id.* at *7. The *Bryant* petitioner's SIRVA treatment spanned three years and she "continued to experience ongoing sequelae (pain and stiffness) since the end of her treatment and argues that her shoulder deficits are permanent." *Id.*

Both the *Bryant* petitioner and Petitioner in the instant case experienced waxing and waning symptoms, with periods of improvement mixed with exacerbation, over several years without a full resolution. Further, as in *Bryant,* Petitioner's injury caused a "substantial" impact on her employment and on the enjoyment of daily life activities. *Id.* at *8. Although Respondent attempts to distinguish *Bryant* on the basis that Petitioner was not a college student, *see* Resp't Reply Br. at 2, this difference in age does not prevent a comparison between the impact on the *Bryant* petitioner's studies and athletic skills, on one hand, and on Petitioner's employment as a dental hygienist, ability to care for her children, and hobbies like bow hunting, on the other. Additionally, I give weight to the fact that Petitioner's post-operative recovery was complicated by an infection, which required

---

[16] *Bryant v. Sec'y of Health & Hum. Servs.*, No. 21-2241V, 2024 WL 1739776 (Fed. Cl. Spec. Mstr. Mar. 20, 2024); *Monson v. Sec'y of Health & Hum. Servs.*, No. 20-1350V, 2023 WL 2524059 (Fed. Cl. Spec. Mstr. Mar. 15, 2023); *Anglewicz v. Sec'y of Health & Hum. Servs.*, No. 20-1504V, 2024 WL 2702415 (Fed. Cl. Spec. Mstr. Feb. 8, 2024).

[17] *Walker v. Sec'y of Health & Hum. Servs.,* No. 19-919V, 2021 WL 6425322 (Fed. Cl. Spec. Mstr. Dec. 7, 2021); *Stoliker v. Sec'y of Health & Hum. Servs.*, No. 17-0990V, 2020 WL 5512534 (Fed. Cl. Spec. Mstr. Aug. 7, 2020); *Rafferty v. Sec'y of Health & Hum. Servs.*, No. 17-1906V, 2020 WL 3495956 (Fed. Cl. Spec. Mstr. May 21, 2020).

long-term antibiotics, and that these antibiotics themselves caused side-effects that caused Petitioner to seek medical attention.

Although Petitioner urges that her injury should be considered even more severe than in *Bryant*, this contention is not supported by the record. *See* Pet'r Br. at 15. The descriptions of severe, constant pain set forth in Petitioner's second declaration are somewhat at odds with her reports of improvement to her treaters, particularly after her surgery and while taking antibiotics. Further, some of Petitioner's complaints may have been caused by her distinct ulnar nerve condition. However, I also see no reason, as Respondent contends, to award less than $140,000.00. *See* Resp't Br. at 18. Although her symptoms fluctuated, Petitioner's condition represents a "moderate to severe SIRVA injury of significant duration" that had a considerable impact on her daily life. *See Bryant*, 2024 WL 1739776, at *7. I find that *Bryant* provides persuasive guidance regarding the compensation that should be awarded in these circumstances.

With regard to Petitioner's other cited cases, *Monson* represents a more severe SIRVA. Petitioner did seek treatment quicker than the *Monson* petitioner, but he received 42 PT sessions, four steroid injections, two MRIs, and then a more extensive surgery that involved five different procedures. *See Monson*, 2023 WL 2524059, at *7. Even accepting Petitioner's argument that she may have received cortisone injections if not for her diabetes, *see* Pet'r Br. at 15, an award at the level of *Monson* would not be appropriate here.

Further, I agree with Petitioner that she experienced a more severe and lengthier injury than in *Anglewicz*, but significantly more compensation should not be awarded here. The *Anglewicz* petitioner's "SIRVA was moderately severe for approximately ten months, or through July 2020, at which point she had achieved at least a substantial recovery." *Anglewicz*, 2024 WL 2702415, at *5. The $130,000.00 awarded in *Anglewicz* also took into account the "temporary stress and disruption to [p]etitioner's role in running a business." *Id.* at *6. An award of $140,000.00 here, not the $160,000.00 requested by Petitioner, reasonably accounts for her post-surgical infection and the effect on her employment and family life.

I do not find Respondent's cases to be sufficiently analogous to support an award in a lower range. Although the *Walker* petitioner attended 54 PT sessions and received multiple steroid injections, it appears that she delayed seeking surgery and had an uncomplicated recovery. *See* 2021 WL 6425322, at *3-*4. In *Stoliker*, I found the petitioner's three and a half year treatment gap before she underwent surgery to be suggestive of "an injury mild enough to tolerate for a long period of time." *See* 2020 WL 5512534, at *3-*4. *Rafferty* is also distinct in that the petitioner's SIRVA was significantly

18

improved by three months after surgery (eight months total after vaccination) and that her post-surgery treatment ceased less than a year after vaccination. *See* 2020 WL 3495956, at \*14. These cases do not present similar factual scenarios, even if in certain instances the individual petitioners received more of one type of treatment.

As stated above, given the circumstances of this case, I find it appropriate to award **$140,000.00** for pain and suffering.[18]

### B.      Lost Wages

The Vaccine Act provides for recovery of "actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections" when the injured party's "earning capacity is or has been impaired by reason of such person's vaccine-related injury[.]" Section 15(a)(3)(A). Lost earnings calculations must be performed in a "cautious manner." *Brown v. Sec'y of Health & Hum. Servs.*, No. 00-0182V, 2005 WL 2659073, at \*6 (Fed. Cl. Spec. Mstr. Sept. 21, 2005). And a lost earnings award "may not be based on speculation." *Moreland v. Sec'y of Health & Hum. Servs.*, No. 18-1319V, 2022 WL 10469047, at \*3 (Fed. Cl. Spec. Mstr. Sept. 2, 2022).

As an initial matter, Respondent questions whether any award of future lost earnings is appropriate, since Petitioner could, theoretically, improve her earning capacity.  *See* Resp't Br. at 34-35. Respondent relies on statements made by PA Griggs that Petitioner's shoulder "may or may get better in relation to her job moving forward," and the suggestion that she could undertake a "work hardening regimen." *Id.* at 34 (citing Ex. 20 at 7; Ex. 32 at 11). Respondent also points to Dr. Schonbrun's statement that "[i]t is possible that Ms. Egbert may benefit from a vocational rehabilitation plan to work in a position outside of that of a dental hygienist due to her physical limitations," and Dr. Mortimer's lay assessment that Petitioner's complaints "seem somewhat inconsistent" with PA Griggs' final physical examination. *See id.* at 34-35.

The mere possibility that Petitioner's condition could improve or that she has some potential for retraining or increased earning capacity, however, is speculative. The record demonstrates that despite attempts to return to work after the vaccination, Petitioner *ultimately* ended up at a one day per week schedule. Due to the nature of her profession, which requires holding her arms at or above shoulder height for long periods, her earning capacity in the field of her chosen and demonstrated expertise has been, and will continue to be, impaired by her SIRVA. Therefore, an award for both past and future lost earnings

---

[18] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at \*1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

is warranted. This leaves the question of what figures will be used for her pre- and post-injury earning capacity.

### 1.    Petitioner's Pre-Injury Earning Capacity

As outlined in Section III, the parties' experts do not agree on Petitioner's pre-injury earning capacity. Dr. Schonbrun opined that Petitioner's full-time (or four days per week) schedule, as she worked in 2015-16 and for part of 2020, was the best measure of her ability to work pre-injury. Ex. 24 at 12. By contrast, Dr. Mortimer believed that Petitioner might return to working part-time again in the future, and thus used the average of her 2015-19 earnings. Ex. A at 9-11.

Dr. Mortimer's framing is based on speculation and assumptions about Petitioner's future behavior. In particular, although Petitioner has a large family, there is no evidence that Petitioner's familial demands would require her to return to a part-time schedule. *See id.* at 11. Indeed, in March 2020, Petitioner had been hired back by Dr. Lewis, and her intention was to end her period of being a stay-at-home parent. *See* Ex. 33 at 1. Dr. Mortimer's inclusion of these years in her average unfairly penalizes Petitioner for her decision to temporarily leave the workforce. Further, there is no evidence that Petitioner's Type 1 diabetes or any other medical issue ever prevented her from working full-time. *See* Ex. A at 10-11. There is thus no basis for Dr. Mortimer's asserted expectation that there will likely be future periods in which Petitioner "will either medically or psychosocially need to work part-time." *See id.*

Overall, Dr. Schonbrun's analysis is better reasoned and better supported by the record, in comparison to the reasoning of Dr. Mortimer. Dr. Schonbrun's opinion is also supported by the schedule that Petitioner was working *at the time* of her SIRVA. *See* Ex. 24 at 11-12. Petitioner had a demonstrated ability to work full-time when not voluntarily choosing limited hours. *See id.* I therefore accept Dr. Schonbrun's calculation that Petitioner's pre-injury earning capacity was a four-day per week schedule, amounting to a total of $66,255.38.

### 2.    Petitioner's Post-Injury Earning Capacity

The parties' experts also do not agree on Petitioner's post-injury earning capacity, with Dr. Schonbrun using a one-day per week schedule, and Dr. Mortimer using a two-day per week schedule. *See id.* at 14; Ex. C at 4. Again, Dr. Mortimer's opinion is less convincing. Dr. Mortimer relied upon a myopic reading of the medical information that she requested. PA Griggs stated that Petitioner could work two to three days per week, which might need to be reduced to one to two days per week. Ex. 31 at 3. However, Dr. Mortimer

ignored that Petitioner did in fact reduce her schedule to one day per week, as PA Griggs indicated would be reasonable, and instead took the average of these options.[19] *See* Ex. C at 4. Dr. Mortimer did not reconcile using a two-day per week schedule with Petitioner's inability to sustain this level of work.

Dr. Schonbrun's opinion is based on Petitioner's *actual and demonstrated* abilities. As of July 2023, after attempting two days per week post-surgery, Petitioner found that she needed to drop down to one day per week. Ex. 24 at 11; Ex. 33 at 1-4; Ex. 23. Petitioner's declaration makes clear that she would work more days if she was physically capable of doing so – only working one day per week required her husband to find a second job to make up for the lost income. *See* Ex 33 at 2. Therefore, I accept Dr. Schonbrun's calculation that $16,563.85 is a reasonable measure of Petitioner's post-injury earning capacity.

### 3.    Net Discount Rate, Tax Rate, and Statistical Work Life

The parties further disagree on the net discount rate. The appropriate computation of this rate has often been at issue in Vaccine Act claims. *See Watkins v. Sec'y of Dep't of Health, Hum. Servs.,* No. 95-154V, 1999 WL 199057, at *4-*9 (Fed. Cl. Spec. Mstr. Mar. 12, 1999) (discussing in detail the calculation of net discount rates and agreeing with the method used by Dr. Kennedy). As I have previously held, Dr. Kennedy's methodology best comports with how this rate has been calculated in prior Vaccine Program cases. *See I.J. v. Sec'y of Health & Hum. Servs.*, No. 16-864V, 2024 WL 6970222, at *12 (Fed. Cl. Mar. 28, 2024); *see also Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *3 (Fed. Cl. Spec. Mstr. Feb. 20, 2024); *Young v. Sec'y of Health & Hum. Servs.*, No. 20-0496V, 2025 WL 3153999, at *7 n.31 (Fed. Cl. Spec. Mstr. Oct. 6, 2025). I therefore find Dr. Kennedy's 1.1 percent net discount rate to be more appropriate than Dr. Cook's variable rate, that averages close to five percent. However, the Vaccine Act only requires that any award of compensation relating to *future damages* shall be reduced to its net present value. Section 15(f)(4)(A).

Otherwise, neither of the parties' economists provided much explanation regarding their selected tax rate or statistical work life expectancy calculations, or what accounts for the differences between them. Dr. Kennedy maintained that a 23 percent tax rate is based on married filing jointly status and "Federal statistics of income data as well as Idaho,

---

[19] Further, it is unclear why Dr. Mortimer gave such import to PA Griggs' opinions. I appreciate that Petitioner chose to pose Dr. Mortimer's questions to PA Griggs, but his notes do not describe any background or training in providing medical assessments regarding work capacity. In fact, PA Griggs suggested that Dr. Johnson had more experience in determining long-term work restrictions. Ex. 31 at 3. As a PA, PA Griggs was also not Petitioner's "treating physician." *See* Resp't Br. at 30; Pet'r Reply Br. at 7.

FICA, and Medicare taxes," with citations. Ex. B at 5. However, Dr. Cook merely stated that the expected future income tax "varies with level of income" – but did not explain the variable rate used in his attached calculations, which also appear to be missing a listed sheet.[20] *See* Ex. 27 at 5; Ex. 28 at 1. Dr. Kennedy's tax rate is therefore better supported, and will be applied.

As to statistical work life, it appears that both experts cited the same reference article, yet arrived at different results. *See* Ex. B at 4 n.10,11; Ex. 27 at 3 n.8. Without further information, I am unable to determine which figure is a better estimate of Petitioner's work life expectancy. Accordingly, the parties should attempt to resolve this dispute themselves (consistent with the need to calculate lost past and future wages). If the parties cannot reach an informal resolution of this issue, they shall propose further briefing in the status report ordered below.

### C.    Out of Pocket Expenses

The parties agree that Petitioner has incurred $2,908.81 in past unreimbursable expenses.

### Conclusion

Based on my consideration of the record as a whole and for reasons set forth in this ruling, I find that $140,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering. I also find that Petitioner is entitled to past and future lost wages, in an amount to be calculated according to section IV.B., along with $2,908.81 in past unreimbursable expenses.

The parties shall file a joint status report updating me on their efforts to finalize the award in this case by no later than **February 16, 2026**. In the status report, they should estimate the amount of additional time needed to fully resolve the issue of damages, and indicate if they have resolved the issue of work life expectancy.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[20] Dr. Kennedy also notes in his report that Dr. Cook overstates Petitioner's lost wages by including a full calendar year for 2020 and not starting from the date of vaccination. Ex. B at 12. I agree that any calculation should begin on September 18, 2020.